Charles E. McNeil
Emma L. Mediak
GARLINGTON, LOHN & ROBINSON, PLLP
350 Ryman Street • P. O. Box 7909
Missoula, MT  59807-7909
Telephone (406) 523-2500
Telefax (406) 523-2595
cemcneil@garlington.com
elmediak@garlington.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| ADMIRAL INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>DUAL TRUCKING, INC., a Louisiana corporation, DUAL TRUCKING OF MONTANA, L.L.C., a Louisiana limited liability company, DUAL TRUCKING AND TRANSPORT, L.L.C., a Louisiana limited liability company, ANTHONY J. ALFORD, a Louisiana Resident,<br><br>Defendants. | CV-20-53-GF-BMM (TLO)<br><br>**ADMIRAL INSURANCE COMPANY'S AMENDED COMPLAINT FOR DECLARATORY JUDGMENT** |

Admiral Insurance Company ("Admiral"), the plaintiff, files this Complaint

for Declaratory Judgment, and with respect, alleges as follows:

### NATURE OF THE ACTION

1.      This is an action under Rule 57, Fed. R. Civ. P., and 28 U.S.C. § 2201

for declaratory judgment.  Admiral requests that this Court declare and determine

that no coverage exists for the allegations made against defendants, Dual Trucking and Transport, LLC ("DTT"), Dual Trucking of Montana, LLC ("DTM"), Dual Trucking, Inc. ("DTI") (collectively referred to as the "Dual Entities"), and Anthony J. Alford, in the complaint filed by Garth L. Harmon and Wagner Harmon in Roosevelt County, Montana, District Court on June 23, 2015, Cause No. DV 15-15 ("The *Harmon* Action");[1] in the complaint filed by the State of Montana Department of Environmental Quality ("the Montana DEQ"), Roosevelt County, Montana, District Court on November 25, 2014, Cause No. DV 14-67 ("The *DEQ* Action");[2] or in the six Violation Letters sent by the Montana DEQ to the Dual Entities.

## PARTIES

2.      Plaintiff, Admiral, is an insurance company authorized to write insurance in Louisiana on a surplus-lines basis; it is a corporation organized under the laws of Delaware and its principal place of business is in Arizona.[3]  It is therefore a citizen of Delaware or Arizona.

3.      Defendant, DTI, is a Louisiana corporation with its principal place of business in Houma, Louisiana.[4]  It is therefore a citizen of Louisiana.

---

[1]  Second Amended Complaint (*Harmon* Action, June 23, 2015) (Doc. 1-2).

[2]  Complaint and Application for Injunction (The *DEQ* Action, Nov. 25, 2014) (Doc. 1-3).

[3]  https://www.ldi.la.gov/onlineservices/ActiveCompanySearch/Results.aspx (last visited January 7, 2020).

[4]  https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=300852_61EA1ECF09 (last visited January 7, 2020).

4.     Defendant, DTT, is a Louisiana limited liability company;[5] its principal place of business is in Houma, Louisiana; and its sole member is Anthony J. Alford, a Louisiana resident.[6]  It and its members are therefore citizens of Louisiana.

5.     Defendant, DTM, is a Louisiana limited liability company;[7] its principal place of business is in Houma, Louisiana, and its members are KJK Trucking, LLC and Alford Farms, LLC.[8]

6.     KJK Trucking, LLC is a Louisiana limited liability company,[9] and its members are Anthony J. Alford, Katherine Alford and Joshua Alford, all Louisiana residents.[10]

7.     Alford Farms, LLC is a Louisiana limited liability company, and its sole member is Barry Alford, a Louisiana resident.[11] DTM and its members are therefore citizens of Louisiana.

---

[5]  https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=956485_7A3C812659
(last visited January 7, 2020).

[6]  Louisiana Secretary of State Records for DTT (Doc. 1-29).
https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=908313_9BCA10E347
(last visited January 7, 2020).

[7]  https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=956485_7A3C812659
(last visited January 7, 2020).

[8]  https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=956485_7A3C812659
(last visited January 7, 2020).

[9]  https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=937327_08B686AD50
(last visited January 7, 2020).

[10]  https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=937327_08B686AD50
(last visited January 7, 2020).

[11]  https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=924350_38931C6FDA
(last visited January 7, 2020).

8.      Defendant, Anthony J. Alford, is an individual who resides in Terrebonne Parish, Louisiana.[12]  He is therefore a citizen of Louisiana.

## JURISDICTION AND VENUE

9.      Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and the plaintiff is a citizen of a different state than each defendant.

10.     Venue is proper in the United States District Court for the Eastern District of Louisiana.  Each of the Dual Entities maintain offices in Houma, Louisiana, and Anthony J. Alford, the individual defendant, resides in Terrebonne, Parish.  Likewise, Admiral issued insurance policies to the Dual Entities at their Houma, Louisiana addresses.

11.     This Court has general personal jurisdiction over the defendants because they are Louisiana legal entities or residents.

12.     This Court has specific personal jurisdiction over the defendants because the declaratory judgment action arises out of insurance policies issued in Louisiana to Louisiana legal entities or residents.

## FACTUAL BACKGROUND

**The DTI/DTM – Harmon Lease Agreements**

13.     DTI leased a tract of real property in Montana from the Harmons in

---

[12] https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=908313_9BCA10E347 (last visited January 7, 2020).

2011 and then assigned its rights in the lease to DTM later that year. DTM and the Harmons then terminated the original lease, and DTM leased from the Harmons three tracts of land, which included the entire portion of the original DTI-Harmon lease. The three leases included a purchase option for DTM.[13]  Together the three tracts constitute the "Bainville Site."

**The September 17, 2012 Montana DEQ Warning Letter**

14.    The Montana DEQ sent a Warning Letter dated September 17, 2012 to DTM, Anthony J. Alford, and others, via certified mail with return receipt requested.[14]

15.    DTT/DTM have admitted to receiving the letter on or about September 17, 2012.[15]

16.    The Warning Letter advised Alford that the DEQ had received a July 26, 2012 complaint alleging oil field waste on the Bainville site in violation of Montana's Solid Waste Management Act.[16]

17.    The Warning Letter further advised Alford that, if these allegations were correct, he was "in violation" of the Solid Waste Management Act because he was operating an unlicensed Solid Waste Management Facility.[17]

---

[13]  Doc 1-2 at 8-9, ¶¶ 34, 38, 42.
[14]  Warning Letter from Montana DEQ to DTT, Violations of the Mont. Waste Mgt. Act [CVID# 15855], September 17, 2012 (Doc. 1-5).
[15]  DTT and DTM's Answer to Second Amended Complaint (Doc. 1-4 at 3, ¶ 52.)
[16]  Doc. 1-5.
[17]  *Id.*

18.     The Warning Letter required Alford to "[i]mmediately discontinue operating the Facility unless it is licensed by DEQ's Solid Waste Program." [18]

19.     The Warning Letter also required Alford to, within 15 days, "hire an environmental consultant and develop a corrective action plan for cleaning up the Special Waste on the Property." [19]

20.     So too, the Warning Letter required that, within 30 days, "the Special Waste must be legally removed and properly disposed of." [20]

**October 2012 Applications for Insurance**

21.     In October 2012, DTI and DTT each submitted applications for environmental pollution insurance.  DTM was added as a Named Insured to policies ultimately issued by Admiral to DTI and DTT, as described below.

22.     The applications are written on application forms identifying "Endurance" at the top, but the 2012 policies were ultimately placed with Admiral.

**2012 DTT EIL Policy Application**

23.     DTT sought coverage for "Onsite Cleanup," a coverage Admiral writes as an Environmental Impairment Liability Policy ("EIL Policy").

//

//

//

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

24.     On the 2012 DTT EIL application, DTT identified the insured facility as a "disposal yard" at "5702 Rd 1009 Bainville, MT 59212," the Bainville site.[21]

25.     On the 2012 DTT application, DTT wrote that "Insured's trucks come to site and unload their load into separation tanks.  The contents generally consist of oil and salt water.  After the separation the contents are hauled off to an approved disposal site." [22]

26.      The 2012 DTT EIL application asked for "copies of recent or applicable environmental reports for each site, including but not limited to:  Phase I or II assessments, corrective action plans, remediation work plans, or closure plans."  DTT answered "none." [23]

27.     The 2012 DTT EIL application provided "[a]ttach any complaint, suit, or correspondence related to any public complaints regarding any emission, discharge, or escape of any pollutant from any of the proposed covered locations to the local community."  DTT answered "none." [24]

28.     The 2012 DTT EIL application asked "[h]as this location ever had any unregulated emission, discharge, release or escape of pollutants or other substances?"  DTT checked the box "no." [25]

---

[21]  DTT & DTM New Business Application EIL at 1, October 1, 2012 (Doc. 1-6).

[22]  *Id.*

[23]  *Id.* at 2.

[24]  *Id.*

[25]  *Id.* at 5.

29.     The 2012 DTT EIL application asked "[i]s the Applicant aware of any pre-existing condition at this location that might lead to a claim under the policy if it were to be issued?"  DTT checked the box "no." [26]

30.     The 2012 DTT application included a section regarding the permits required for the insured site and requested the permit ID numbers.  DTT indicated that the only permit required was a DPDES Storm Water Permit or State Equivalent. [27]

31.     The 2012 DTT EIL application asked "[i]s the Applicant/Facility currently in compliance with all applicable environmental regulations?"  DTT checked the box "yes." [28]

32.     The 2012 DTT application asked "[h]as the Applicant/Facility ever been cited for any environmental or permit violation?"  DTT checked the box "no." [29]

33.     The 2012 DTT EIL application asked "[h]as the location/facility, during the last five years, been cited or prosecuted for any violation of any standard or law relating to the release of a substance into the environment?"  DTT checked the box "no." [30]

_____

[26]  *Id.*

[27]  *Id.*

[28]  *Id.*

[29]  *Id.*

[30]  *Id.* at 9.

34.     DTT's Chief Financial Officer, T. Walter Berry, signed the DTT EIL application on October 3, 2012. [31]

**2012 DTT CPL Policy Application**

35.     DTT also sought coverage for environmental liability, which Admiral writes as a Contractors Pollution Liability Policy ("CPL Policy").

36.     The 2012 DTT CPL application included a handwritten note that DTT was "currently covered under pol # ECC10101327600."[32]

37.     In a separate section, the 2012 DTT CPL application identifies DTT's prior liability insurance to include "Contractors Pollution Liability" policy number "ECC10101327600" with Endurance, with a retroactive date of September 30, 2011. [33]

38.     On the 2012 DTT CPL application, DTT identifies the business as having 3 clerical staff, 2 principals, and "200" "Truck Drivers." [34]

39.     The 2012 DTT CPL application asked "[i]n the past 3 years, has any claim, suit, or notice of incident been made against your firm, a predecessor firm or an organization for which your firm has assumed liabilities?"  DTT checked the box "no." [35]

---

[31] *Id.* at 4.

[32] DTT Environmental Service Providers Application, October 1, 2012 (Doc. 1-7 at 1).

[33] *Id.*

[34] *Id.* at 2.

[35] *Id.*  at 4.

40.     The 2012 DTT CPL application asked whether, in the past three years, any member of the application firm was "aware of any circumstances that could result in a claim, suit or notice of incident being brought against them?"  DTT checked the box "no." [36]

## 2012 DTI CPL Policy Application

41.     DTI also sought coverage for environmental liability, which is Admiral's CPL form.

42.     The 2012 DTI CPL application identifies the business as having "150" "truck drivers" and the business being "100%" "Industrial – Oil companies Haul drilling fluids."[37]

43.     The 2012 DTI CPL application asked "[i]n the past 3 years, has any claim, suit, or notice of incident been made against your firm, a predecessor firm or an organization for which your firm has assumed liabilities?"  DTT checked the box "no." [38]

44.     The 2012 DTI CPL application asked whether, in the past three years, any member of the applicant was "aware of any circumstances that could result in a claim, suit or notice of incident being brought against them?"  DTT checked the box "no." [39]

---

[36] *Id.*
[37] DTI CPL Environmental Service Providers Application, October 1, 2012 (Doc. 1-8 at 2).
[38] *Id.* at 4.
[39] *Id.*

45.     DTI signed the 2012 DTI CPL application on October 2, 2012.[40]

**2012-2013 Admiral Insurance Policies**

46.     In reliance on the information provided by DTT and DTI in the applications for insurance, Admiral issued three insurance policies to DTT, DTM, and DTI.

47.     Admiral issued EIL Policy Number FEI-EIL-10415-00 to DTT with a policy period from October 1, 2012 to October 1, 2013, providing coverage for the Bainville site.[41]

48.     Admiral issued CPL Policy Number FEI-ECC-10294-00 to DTT with a policy period from October 1, 2012 to October 1, 2013.[42]  DTM is also a Named Insured under this policy.[43]

49.     Admiral issued CPL Policy Number FEI-ECC-10295-00 to DTI with a policy period from October 1, 2012 to October 1, 2013.[44] DTM is also a Named Insured under this policy.[45]

//

//

//

---

[40] *Id*. at 6.

[41] DTT EIL Policy No. FEI-EIL-10415-00, Oct. 1, 2012 to Oct. 1, 2013 (Doc. 1-9 at 8).

[42] DTT CPL Policy No. FEI-ECC-10294-00, Oct. 1, 2012 to Oct. 1, 2013 (Doc. 1-10).

[43] *Id*. at 43.

[44] DTI CPL Policy No. FEI-ECC-10295-00, Oct. 1, 2012 to Oct. 1, 2013 (Doc. 1-11).

[45] *Id*. at 42.

**The Four 2013 Montana DEQ Violation Letters**

**March 13, 2013 Violation Letter for the Solid Waste Management Facility, CVID #  15855 (First Violation Letter)**

50.     The Montana DEQ sent a Violation Letter dated March 13, 2013 to three individuals associated with DTT, including Alford, via certified mail.[46]

51.     The Letter asserts that DTT had not performed the required items listed in the September 17, 2012 Warning Letter relating to the Solid Waste Management Facility that DTT was operating at the Bainville site. [47]

52.     The Letter also asserts that someone at DTT must have received the September 17, 2012 Warning Letter because Mr. Knudson, an attorney said to represent DTT, left the Montana DEQ a message on September 19, 2012, concerning the Warning Letter and spoke with the Montana DEQ on September 20, 2012. [48]

53.     The Letter notes that the Bainville Site was in "violation of the Solid Waste Management Act" and that DTT must take the four steps listed in the Warning Letter to bring the site into compliance with state law.[49]

//

//

---

[46]  Violation Letter from Montana DEQ to DTT, Violations Solid Waste Mgmt. Act [CVID #15855], March 13, 2013 (Doc. 1-12).

[47]  *Id.*

[48]  *Id.*

[49]  *Id.*

### March 13, 2013 Violation Letter for the Poseidon Tank Leak, CVID # 16391 (Second Violation Letter)

54.     The Montana DEQ sent a second Violation Letter dated March 13, 2013 to three individuals associated with DTT, including Alford, via certified mail.[50]

55.     The Montana DEQ advised that it had received a report of a leak from an above ground Poseidon Tank at the Bainville site.[51]

56.     The Montana DEQ also advised that a spill of liquid invert qualified as an improper disposal of solid waste and constituted a violation of the Montana Solid Waste Management Act.[52]

### March 13, 2013 Violation Letter for Burning Waste, CVID # 16354 (Third Violation Letter)

57.     The Montana DEQ sent a third Violation Letter to DTT on March 13, 2013.[53]  DTT responded to this third Violation Letter, CVID #16354 and CVID #16391, with a single letter dated March 20, 2013. [54]

58.     The third Violation Letter, CVID # 16354, related to burning of waste at the Bainville Site. [55]

---

[50]  Violation Letter from DEQ to DTT, Violations Solid Waste Mgmt. Act (CVID #16391), March 13, 2013 (Doc. 1-13).

[51]  *Id.*

[52]  *Id.*

[53]  Letter from DTT to Thomas P. Bovington, CVID #16354 and CVID #16391, March 20, 2013 (Doc. 1-14).

[54]  *Id.*

[55]  *Id.*

**August 2, 2013 Violation Letter for the Solid Waste Management Facility (Fourth Violation Letter)**

59.     The Montana DEQ sent a fourth Violation Letter dated August 2, 2013 to DTT related to the unlicensed facility at the Bainville site.[56]  The August 2, 2013 Violation Letter notes that DTT had submitted an application for a solid waste management system license on June 10, 2013. [57]

60.     The Letter also notes that DTT was engaged in the ongoing management of solid wastes at the facility that qualifies as operating a Solid Waste Management System without a license in violation of the Montana Solid Waste Management Act. [58]

**The September 2013 Notice of Breach of Contract**

61.     The Harmons sent Alford and DTM a letter dated September 25, 2013, via email and registered mail.[59]  The letter asserts that DTM had breached the three lease agreements for the Bainville site; that DTM had caused water pollution, and that DTM had caused environmental impairment to the Bainville site, to adjacent property owned by the Harmons, and to adjacent property owned by others.[60]  The letter asserts further that DTM was not in compliance with

---

[56]  Letter from DEQ to D. Prosperie, Proposed DTT Facility – Bainville, Montana, Site Inspection Rep. - Violation Letter, August 23, 2013 (Doc. 1-15).

[57]  *Id.*

[58]  *Id.*

[59]  Letter from Richard S. Oelsner to DTM, September. 25, 2013 (Doc. 1-16).

[60]  *Id.*

Federal, State, or local laws and demanded that DTM notify the Harmons of DTM's plans to clean up or remove the toxic or hazardous materials from the property.[61]

**2013 Applications for Insurance**

62.     In 2013, DTI and DTT again each filled out applications for insurance to cover environmental pollution for a policy period beginning on October 1, 2013.

**2013 DTT EIL Policy Application**

63.     DTT sought to renew its EIL Policy for the Bainville site.  On the 2013 DTT EIL application, DTT identifies the insured site as a "solid waste processing facility" rather than a "disposal yard."[62]

64.     On the 2013 DTT EIL application, DTT states that "Insured's trucks bring land gas drilling solid waste to the facility to process to meet Class II landfill requirements in MT, ND & Canada.  Once processed the product is transported to an approved disposal site."[63]

65.     On the 2013 DTT EIL application, DTT again identifies the insured facility as "5702 County Rd 1009, Bainville, MT 59212," the Bainville site. [64]

66.     The 2013 DTT EIL application asked for "copies of recent or applicable environmental reports for each site, including but not limited to:  Phase

---

[61]  *Id.*

[62]  DTT Application EIL Insurance at 1, October 1, 2013 (Doc. 1-17).

[63]  *Id.*

[64]  *Id.*

I or II assessments, corrective action plans, remediation work plans, or closure

plans."  None were attached. [65]

68.     The 2013 DTT EIL application provided "[a]ttach any complaint, suit,

or correspondence related to any public complaints regarding any emission,

discharge, or escape of any pollutant from any of the proposed covered locations to

the local community."  None were attached. [66]

68.     The 2013 DTT EIL application asked "[h]as this location ever had any

unregulated emission, discharge, release or escape of pollutants or other

substances?"  DTT did not check either yes or no. [67]

69.     The 2013 DTT EIL application asked "[i]s the Applicant aware of any

pre-existing condition at this location that might lead to a claim under the policy if

it were to be issued?"  DTT checked the box "no." [68]

70.     The 2013 DTT application included a section regarding the permits

required for the insured site and requested the permit ID numbers.  DTT indicated

that it had "applied for" a RCRA Part B Permit or State Equivalent and provided

its NPDES or State Equivalent permit number.[69]

//

---

[65] *Id.* at 2.

[66] *Id.*

[67] *Id.*

[68] *Id.* at 5.

[69] *Id.*

71.    The 2013 DTT EIL application asked "[i]s the Applicant/Facility currently in compliance with all applicable environmental regulations?" DTT checked the box "yes."[70]

72.    The 2013 DTT application asked "[h]as the Applicant/Facility ever been cited for any environmental or permit violation?"  DTT checked the box "no."[71]

73.    The 2013 DTT EIL application asked "[h]as the location/facility, during the last five years, been cited or prosecuted for any violation of any standard or law relating to the release of a substance into the environment?"  DTT checked the box "no."[72]

74.    The 2013 DTT EIL application asked "[h]as the location/facility ever been sued or requested to pay any damages or to perform any cleanup activities with respect to any actual alleged pollution incident either on the facility grounds or to an offsite party or location?"  DTT checked the box "no."[73]

75.    The 2013 DTT EIL application was signed by DTT's Chief Financial Officer on August 21, 2013.[74]

//

_____

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.* at 4.

**2013 DTT CPL Policy Application**

76.     DTT also sought to renew its CPL insurance policy in 2013.

77.     On the 2013 DTT CPL application, DTT no longer identified DTT as having any truck drivers.  Instead, the only staff DTT identified were two (2) clerical staff, two (2) administrative management, and eleven (11) processing labor employees.[75]

78.     On the 2013 DTT CPL application, DTT identified "trucking" as an area that was subcontracted to others.[76]

79.     The 2013 DTT CPL asked "[i]n the past 3 years, has any claim, suit, or notice of incident been made against your firm, a predecessor firm or an organization for which your firm has assumed liabilities?"  DTT checked the box "no."[77]

80.     The 2013 DTT CPL application asked whether, in the past three years, any member of the application firm was "aware of any circumstances that could result in a claim, suit or notice of incident being brought against them?"  DTT checked the box "no."[78]

81.      DTT's Chief Financial Officer signed the application on August 21, 2013.[79]

---

[75] DTT Environmental Service Providers Application CPL Insurance, August 21, 2013 (Doc. 1-18 at 2).
[76] *Id*. at 3.
[77] *Id*. at 4.
[78] *Id*.
[79] *Id*. at 6.

**2013 DTI CPL Policy Application**

82.    DTI sought to renew its CPL insurance policy in 2013.

83.    On the 2013 DTI CPL application, DTI identifies the business as having what appears to be "228" "Truck Drivers" and the business being "100%" "Industrial – Oil companies Haul drilling fluids."[80]

84.    On the 2013 DTI CPL application, DTI identifies the business income as being "100%" from "trucking."[81]

85.    The 2013 DTI CPL application asked "[i]n the past 3 years, has any claim, suit, or notice of incident been made against your firm, a predecessor firm or an organization for which your firm has assumed liabilities?"  DTI checked the box "no."[82]

86.    The 2013 DTI CPL application asked whether, in the past three years, any member of the application firm was "aware of any circumstances that could result in a claim, suit or notice of incident being brought against them?"  DTI checked the box "no."[83]

87.    DTI signed the 2013 DTI CPL application on August 12, 2013.[84]

//

---

[80] DTI Environmental Service Providers Application CPL Insurance, August 12, 2013 (Doc. 1-19 at 2-3).

[81] *Id.* at 3.

[82] *Id.* at 4.

[83] *Id.*

[84] *Id.* at 6.

**2013-2014 Admiral Insurance Policies**

88.    In reliance on the information provided by DTT and DTI in the applications for insurance, Admiral issued three insurance policies to DTT, DTM, and DTI.

89.    Admiral issued EIL Policy Number FEI-EIL-10415-01 to DTT, with a policy period from October 1, 2013 to October 1, 2014, for the Bainville site.[85] DTM is also a named insured under this policy. [86]

90.    Admiral issued CPL Policy Number FEI-ECC-10294-01 to DTT with a policy period from October 1, 2013 to October 1, 2014.[87] DTM is also a named insured under this policy.[88]

91.    Admiral issued CPL Policy Number FEI-ECC-10295-01 to DTI with a policy period from October 1, 2013 to October 1, 2014.[89]

**The April 22, 2014 Violation Letter (Fifth Violation Letter)**

92.    The Montana DEQ sent a fifth Violation Letter dated April 22, 2014 to DTT related to the unlicensed facility at the Bainville site.[90]

//

---

[85] DTT EIL Policy No. FEI-EIL-10415-01, Oct. 1, 2013 to Oct. 1, 2014 (Doc. 1-20 at 47).

[86] *Id.* at 46.

[87] DTT CPL Policy No. FEI-ECC-10294-01, Oct. 1, 2013 to Oct. 1, 2014 (Doc. 1-21).

[88] *Id.* at 40.

[89] DTI CPL Policy No. FEI-ECC-10295-01, Oct. 1, 2013 to Oct. 1, 2014 (Doc. 1-22).

[90] Letter from Montana DEQ, Request Cease Solid Waste Mgmt. Operations DTM (FID 2271), April 22, 2014 (Doc. 1-23).

93.    The April 22, 2014 Violation Letter states that DTT had illegally managed solid wastes at the Bainville site without a Solid Waste Management License since at least July 2012.[91]

94.    The Letter references the September 17, 2012 Warning Letter sent by the Montana DEQ related to this violation and the March 13, 2013 Violation Letter related to this violation. [92]

95.    The Letter notes that DTT had submitted an application, but the Montana DEQ had found the application to be deficient and DTT had not adequately responded to the deficiency letter.  The Montana DEQ advised that the application was expired and DTT must submit a new license application.[93]

96.    The Letter also references DTT's December 13, 2013 admission that there were three suspected or known waste or storm water releases. [94]

**The May 2014 Settlement Negotiations with the Harmons
for Environmental Contamination at the Bainville Site**

97.    DTM and the Harmons engaged in settlement negotiations regarding the environmental contamination at the Bainville Site and DTM's proposed purchase of the Bainville site.

//

---

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.*

98.     On May 20, 2014, Garth Harmon emailed DTM representative, Walter Berry, with the subject line "Dual Trucking Settlement?"  Harmon wrote "I forgot to add that you keep your insurance during this time, or my lawyers can agree with you on some other agreeable terms pertaining to the environmental issues."  Harmon continued "[a]s far as the subdivision getting done there is no reason possible that it won't get done before October 1st unless there's been an environmental problem created from Dual that prevents us to get it done."[95]

99.     On May 22, 2014, Walter Berry wrote back to Harmon, "I shared your email with Tony [Alford] and recapped our conversation."  Berry continued, "[w]e are ready to move forward."

**The June 26, 2014 Violation Letter (Sixth Violation Letter)**

100.    The Montana DEQ sent a sixth Violation Letter dated June 26, 2014 to DTT related to the unlicensed facility at the Bainville site.[96]

101.    The June 26, 2014 Violation Letter was sent to the registered agent for DTM, the registered agent for DTI, and Alford by certified mail, return receipt requested, to the same addresses used for the April 22, 2014 Violation Letter. [97]

//

//

---

[95] Email from Garth Harmon to Walter Berry, Fwd: Dual Trucking Settlement? (May 20, 2014 8:02 PM) (Doc. 1-24 at 2).

[96] Ltr. from Mont. DEQ, Violations of the Water Quality Act (FID 2271), June 26, 2014 (Doc. 1-25).

[97] *Id.*

102.   The June 26, 2014 Violation Letter was copied via email to DTT's attorney Alan Joscelyn at Gough, Shanahan, Johnson & Waterman, PLLP in Helena, MT. [98]

103.   The Letter states that water samples collected near the Bainville site had elevated levels of hydrocarbons.[99]

104.   The Letter notes DTT's December 13, 2013 admission that there were three suspected or known waste or storm water releases. [100]

105.   The Letter also states that the Montana DEQ believed that these releases had resulted in the elevated hydrocarbon levels and constituted a violation of the Montana Water Quality Act. [101]

106.   Then the Letter required that DTT collect additional water and soil samples to verify if hydrocarbons remain and the extent of any contamination. [102]

107.   The Letter also required DTT to modify or construct controls to prevent any additional discharges. [103]

**2014 Cancellation of Policy and Notice of Claim**

108.   DTT cancelled the 2013 DTT EIL Policy effective July 1, 2014 and received a partial reimbursement of the premium.[104]

---

[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] Doc. 1-20 at 47.

109.   Then, on July 2, 2014, Admiral received a notice of claim for the 2013 DTT EIL Policy for pollution at the Bainville site.[105]  Admiral received a notice of claim from DTI under the 2013 DTT EIL Policy for pollution at the Bainville site on July 3, 2014. [106]  Both of the Notice of Claims provide that "Insured was served with a violation letter" indicating "water samples taken contained contaminated contents.  The insured is required to produce further water and soil samples by 7/30/2014 to reflect whether hydrocarbons remain."  The Notice of Claims further provide that the insured "must also modify and or construct to prevent additional discharge."[107]

**The Montana DEQ Enforcement Action**

110.   On November 25, 2014, the Montana DEQ filed a Complaint and Application for Injunction against DTT related to its use of the Bainville Site as an unlicensed solid waste disposal facility.[108]

111.   The Montana DEQ alleges that DTT operated an unlicensed waste facility at the Bainville Site from July 26, 2012 until April 30, 2014.[109]

**Retention of Terracon**

112.   In response to the alleged pollution at the Bainville site, DTT hired Terracon Consultants, Inc. ("Terracon"), an environmental consulting firm in

---

[105]  Exhibit BB, ACORD Gen. Liab. Notice Occurrence/Claim at 1 (Jul. 2, 2014).
[106]  ACORD General Liability Notice Occurrence/Claim, July 3, 2014 (Doc. 1-26 at 1).
[107]  Exhibit BB; Doc. 1-26.
[108]  Doc. 1-3.
[109]  *Id.*, ¶ 148.

Billings, Montana, to conduct a Phase I Site Assessment and a Limited Site

Investigation that included sampling.[110]

113.   Terracon has concluded that no contamination had migrated off of the

leased Bainville Site into neighboring property and that the elevated Hydrocarbon

levels Montana DEQ had found were likely related to agricultural chemicals.[111]

114.   Admiral and Endurance have paid for Terracon's assessments under a

full reservation of rights.

**The *Harmon* Action**

115.   The Harmons filed the *Harmon* Action against DTT, DTM, DTI,

Alford, and others on June 23, 2015.[112]

116.   The Harmons allege that DTT, DTM, DTI, and/or Alford have

operated an unlicensed solid waste management system on the Bainville site and

have caused or allowed pollutants to remain on the site and migrate off the site to

surrounding properties.[113]

117.   The Harmons point to the allegations in the Montana DEQ

Enforcement Action in support of their contentions. [114]

118.   DTM filed a counterclaim and has filed a separate quiet title action

alleging that DTM had a lease-to-own agreement for the entire Bainville Site and

---

[110]  Terracon Limited Site Investigation Rep., Oct. 21, 2016 (Doc. 1-27 at 1).
[111]  *Id.* at 19.
[112]  Doc 1-2.
[113]  *Id.* at 18.
[114]  *Id.* at 20-21.

that the Harmons received full payment for the Bainville Site but have refused to transfer title to DTM. [115]

**Admiral's Defenses Under Reservations of Rights**

119.   Admiral has defended DTT under a reservation of rights related to the Montana DEQ's Sixth Violation Letter, which it first became aware of on July 2, 2014. This includes a defense of the *DEQ* Action.

120.   Admiral has also defended DTT, DTM, DTI, and Alford against the *Harmon* Complaint under a full reservation of rights.

## COUNTS FOR DECLARATORY RELIEF

**COUNT I:   DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS UNDER THE 2012 EIL POLICY BECAUSE NO CLAIM WAS MADE DURING THE 2012-2013 POLICY YEAR**

121.   Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

122.   The EIL policies are "claims made" policies.  They provide coverage for certain pollution conditions if the pollution condition was "reported to the Company during the Policy Period, the Automatic Extended Reporting Period or the Optional Extended Reporting Period, if any."[116]

//

---

[115]  Doc. 1-4 at 13; 3d Amend. Comp., *DTM v. Harmons*, No. DV-2015-17 (Mont. 15th Jud. Dist. Ct., Roosevelt Cty., Jan. 4, 2017) (Doc. 1-28).

[116]  Docs. 1-9 & 1-20 at 8.

123.   No coverage exists under the 2012-2013 EIL Policy because Admiral did not receive notice of any claim related to the Bainville site during the 2012-2013 policy year (October 1, 2012 to October 1, 2013).[117]

124.   Because coverage does not exist under the 2012-2013 EIL Policy, Admiral is entitled to a declaration that no duty to defend exists.

125.   Because coverage does not exist under the 2012-2013 EIL Policy, Admiral is entitled to a declaration that no duty to indemnify exists.

**COUNT II:   DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS UNDER THE 2013 EIL POLICY BECAUSE THE SIXTH VIOLATION LETTER WAS RECEIVED BY DTT AND THE POLLUTION CONDITION WAS DISCOVERED BEFORE THE AUTOMATIC EXTENDED REPORTING PERIOD**

126.   Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

127.   DTT cancelled the 2013-2014 EIL Policy effective July 1, 2014.[118]

128.   Admiral had not received notice of any claim under the 2013-2014 EIL Policy as of July 1, 2014.

129.   The EIL Policies provide that an insured is entitled to an automatic thirty-day extended reporting period upon cancellation of the Policy.[119]

---

[117]  Doc. 1-9 at 8.

[118]  Doc. 1-20 at 49.

[119]  Doc. 1-9 at 23.

130.   The Automatic Extended Reporting Period for the 2013-2014 EIL Policy ran from July 1, 2014 for thirty days.

131.   Admiral first received notice of a claim related to the Bainville site from DTT on July 2, 2014[120] and from DTI on July 3, 2014.[121]

132.   The EIL Policies provide that the "Automatic Extended Reporting Period shall apply to Claims first made within the Automatic Extended Reporting Period but only with respect to Pollution Conditions that (a) are Discovered and reported during the Automatic Extended Reporting Period and (b) commenced during the Policy Period or after the Retroactive Date, if any." [122]

133.   The EIL Policies define a claim as "written notice during the Policy Period" to "an Insured from a Third Party seeking to hold any Insured responsible for Liabilities resulting from Pollution Conditions" or "by the Insured seeking coverage for Cleanup Costs resulting from Pollution Conditions." [123]

134.   The EIL Policies define "Discovered" as "the point in time at which any officer, director, executive or employee responsible for environmental compliance of an Insured becomes aware of the existence of a Pollution Condition." [124]

---

[120]  Exhibit BB.

[121]  Doc. 1-26.

[122]  Doc. 1-20 at 23; Doc. 1-9 at 23.

[123]  Doc. 1-20 at 10; Doc. 1-9 at 10.

[124]  Doc. 1-20 at 12; Doc. 1-9 at 12.

135.   The Bainville site claim made by DTT on July 2, 2014 was based on the Sixth Violation letter, which was sent by the Montana DEQ on June 26, 2014 by certified mail and with an email copy to DTT's Montana attorney.

136.   The Claim made by DTT on July 2, 2014 related to alleged contamination of the Bainville site and the Harmon's adjacent property.  DTM and Alford had received notice of this alleged contamination in September 2013 and engaged in settlement discussions with Harmons over this alleged contamination in May 2014.

137.   No coverage exists under the 2013-2014 EIL Policy because DTT received notice of this Claim before the Automatic Extended Reporting Period and DTT discovered the pollution condition at the Bainville site before the Automatic Extended Reporting Period.

138.  Because coverage does not exist under the EIL Policies, Admiral is entitled to a declaration that no duty to defend exists.

139.   Because coverage does not exist under the EIL Policies, Admiral is entitled to a declaration that no duty to indemnify exists.

**COUNT III:   DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS UNDER THE EIL POLICIES FOR POLLUTION CONDITIONS, WHICH THE APPLICANT WAS AWARE OF BEFORE THE COVERAGE BEGAN**

140.   Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

141.    The EIL Policies provide coverage for certain costs and expenses resulting from "Pollution Conditions" that "commenced during the Policy Period . . . and were Discovered and reported to the Company during the Policy Period." [125]

142.    The EIL Policies define "Pollution Conditions" as "the gradual or sudden unintended discharge, dispersal, release or escape of Pollutants." [126]

143.    The EIL Policies define "Discovered" as "the point in time at which any officer, director, executive or employee responsible for environmental compliance of an Insured becomes aware of the existence of a Pollution Condition." [127]

144.    Similarly, the EIL Policies exclude coverage for "[a]ny Pollution Conditions Discovered before the inception of this Policy." [128]

145.    Although the 2012 EIL Policy did not commence until October 1, 2012, [129] the *DEQ* Action alleges that beginning on July 26, 2012, DTT operated an unlicensed solid waste disposal site.[130]

146.    Likewise, although the 2013 EIL Policy did not commence until October 1, 2013,[131] the second Violation Letter to DDT dated March 13, 2013

---

[125]  Docs. 1-9 & 1-20 at 8.

[126]  Docs. 1-9 & 1-20 at 16.

[127]  Docs. 1-9 & 1-20 at 12.

[128]  Docs. 1-9 & 1-20 at 19.

[129]  Doc. 1-9 at 8.

[130]  Doc. 1-3 at 3, ¶ 15.

[131]  Doc. 1-20 at 47.

identifies an alleged leak from an above ground Poseidon Tank at the Bainville site.[132]

147.   DTM and Alford also received a September 25, 2013 letter from the Harmons alleging contamination at the Bainville Site and on the Harmons' adjacent property.[133]

148.   The April 22, 2014 Violation Letter references DTT's December 13, 2013 admission that there were three suspected or known waste or storm water releases from the Bainville site.[134]

149.   No coverage exists under the 2012-2013 EIL Policy for any pollution conditions that DTT first discovered before the policy period.

150.   No coverage exists under the 2013-2014 EIL Policy for any pollution conditions that DTT first discovered before that policy period.

151.   Because coverage does not exist under the EIL Policies, Admiral is entitled to a declaration that no duty to defend exists.

152.   Because coverage does not exist under the EIL Policies, Admiral is entitled to a declaration that no duty to indemnify exists.

///

///

---

[132]  Doc. 1-13.

[133]  Doc. 1-16.

[134]  Doc. 1-23.

**COUNT IV:     DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS UNDER THE EIL POLICIES DUE TO MATERIAL MISSTATEMENTS IN THE EIL APPLICATIONS**

153.   Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

154.   The EIL Policies provide that "[i]f the Insured wilfully [sic] concealed or misrepresented any fact or circumstance material to the granting of coverage under this Policy, this entire Policy shall be void." [135]

155.   The EIL Policies provide that:

The Named Insured acknowledges and agrees that:

- The information, warranties and representations contained in the application submitted by the Insured as well as in all supplemental documents provided herewith are true, correct and complete; and
- The Company has issued this Policy in specific reliance upon the truth and accuracy of the warranties and representations contained in the application.
- A signed copy of the application is kept on file by the Company.
- All activities of the Insured have been and will be conducted in full compliance with Environmental Laws.

The applications, the declarations and endorsements, if any, are incorporated into, and are part of, this Policy and embody all agreements existing between the Named Insured and the Company and supersede all prior agreements, whether written or oral, expressed or implied. [136]

---

[135]  Docs. 1-9 & 1-20 at 31.

[136]  Docs. 1-9 & 1-20 at 30.

156.   DTT failed to disclose to Admiral the September 19, 2012 Warning Letter in its application for the 2012-2013 EIL Policy.[137]

157.   DTT failed to disclose to Admiral the four 2013 Violation Letters in its application for the 2013-2014 EIL Policy.[138]

158.   DTT failed to disclose to Admiral the September 25, 2013 letter DTM and Alford received from the Harmons alleging contamination to the Bainville site and the Harmons' adjacent property.

159.   No coverage exists under the EIL Policies because DTT made material misstatements and/or omissions on their 2012-2013 and 2013-2014 applications for EIL coverage.

160.   Because coverage does not exist under the EIL Policies, Admiral is entitled to a declaration that no duty to defend exists.

161.   Because coverage does not exist under the EIL Policies, Admiral is entitled to a declaration that no duty to indemnify exists.

**COUNT V:   DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS UNDER THE POLICIES FOR THE INSUREDS' INTENTIONAL OR ILLEGAL ACTS.**

162.   Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

---

[137]  Doc. 1-6.

[138]  Doc. 1-17.

163.   The EIL Policies exclude coverage for any claims arising out of, based upon, resulting from or with respect to any Insured's:

- [I]ntentional, willful, deliberate non-compliance with any statute, regulation, ordinance, administrative complaint or notice of violation,
- notice letter, executive order or instruction of any governmental agency or body; or
- dishonest, illegal, fraudulent or criminal act. [139]

164.   The *DEQ* Action alleges that DTT failed to comply with Montana law.[140]

165.   The Warning Letter and the Six Violation Letters allege that DTT failed to comply with Montana law.[141]

166.   The *Harmon* Action alleges that DTT failed to comply with Montana law.[142]

167.   No coverage exists under the EIL Policies for any claims arising out of, based upon, resulting from or with respect to DTT or DTM's non-compliance with Montana law, with a notice violation, or with any illegal or criminal acts.

168.   Because coverage does not exist under the EIL Policies, Admiral is entitled to a declaration that no duty to defend exists.

//

---

[139]  Docs. 1-9 & 1-20 at 19.

[140]  Doc 1-3 at 2, ¶ 9.

[141]  Docs. 1-4, 1-12 to 1-15, 1-23 1-25.

[142]  Doc. 1-2 at 11-15.

169.    Because coverage does not exist under the EIL Policies, Admiral is

entitled to a declaration that no duty to indemnify exists.

**COUNT VI:  DECLARATORY JUDGMENT THAT NO COVERAGE
EXISTS UNDER THE EIL POLICIES DUE TO INSUREDS'
FAILURE TO GIVE PROMPT NOTICE OR TO MITIGATE
DAMAGES**

170.    Admiral re-alleges and re-pleads the allegations in the above

paragraphs as though set forth herein.

171.    The EIL policies require the named insured to "make all reasonable

efforts to abate, stop, prevent or reduce the Liabilities, Cleanup Costs and Defense

Costs caused by any Pollution Condition(s)." [143]

172.    The EIL policies further require that the cleanup efforts "[s]hall

commence immediately when a Pollution Condition is Discovered." [144]

173.    The EIL policies also require the named insured to "immediately

provide written notice of any Pollution Conditions Discovered or Claim received."

[145]

174.    The *DEQ* Action alleges that DTT operated an unlicensed solid waste

disposal site beginning on July 26, 2012.[146]

//

---

[143]  Docs. 1-9 & 1-20 at 27.

[144]  Docs. 1-9 & 1-20 at 27.

[145]  Docs. 1-9 & 1-20 at 25.

[146]  Doc. 1-3 at 3, ¶ 15.

175.   The second Violation Letter to DTT dated March 13, 2013 relates to an alleged leak from an above ground Poseidon Tank at the Bainville site. [147]

176.   DTM and Alford received a September 25, 2013 letter from the Harmons alleging contamination to the Bainville site and the Harmons' adjacent property. [148]

177.   DTM and Alford engaged in settlement negotiations with the Harmons in May 2014 regarding the environmental contamination at the Bainville Site and DTM's proposed purchase of the Bainville site. [149]

178.   The June 26, 2014 Violation Letter notes DTT's December 13, 2013 admission that there were three suspected or known waste or storm water releases from the Bainville site. [150]

179.   No coverage exists under the EIL Policies for any pollution conditions which were not immediately reported to Admiral and/or which were not immediately abated by DTT and/or DTM.

180.   Because coverage does not exist under the EIL Policies, Admiral is entitled to a declaration that no duty to defend exists.

181.   Because coverage does not exist under the EIL Policies, Admiral is entitled to a declaration that no duty to indemnify exists.

---

[147]  Doc. 1-13.

[148]  Doc. 1-16.

[149]  Doc. 1-24 at 2.

[150]  Doc. 1-25.

**COUNT VII:   DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS FOR CLEANUP COSTS FOR ANY POLLUTION CONDITION THAT DID NOT RESULT FROM A SUDDEN UNINTENDED DISCHARGE OF THE CONTENTS OF ABOVE GROUND STORAGE TANKS**

182.   Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

183.   The EIL Policies provided coverage for certain Cleanup Costs, in addition to other coverage. [151]

184.   The 2012-2013 EIL Policy defines "Cleanup Costs" to mean cleanup costs incurred resulting from "a sudden unintended discharge of the contents of the following aboveground storage tank(s) located at a Scheduled Location:  Four 400-bbl ASTs."[152]

185.   The 2013-2014 EIL Policy defines "Cleanup Costs" to mean cleanup costs incurred resulting from "a sudden unintended discharge of the contents of an aboveground storage tank(s) located at a Scheduled Location."[153]

186.   The Second Violation Letter alleged a leak from an above ground Poseidon Tank in 2013. [154]  An above ground Poseidon Tank was not one of the four 400-bbl covered above ground storage tanks covered under the 2012-2013 EIL Policy.

---

[151]  Docs. 1-9 & 1-20 at 8.

[152]  Doc. 1-9 at 36.

[153]  Doc. 1-20 at 35.

[154]  Doc. 1-13.

187.   The Sixth Violation Letter does not allege a discharge from an above ground storage tank. [155]

188.   The DEQ Complaint does not allege a discharge from an above ground storage tank.[156]

189.   The *Harmon* Action does not allege a discharge from an above ground storage tank.[157]

190.   Because the alleged pollution condition at the Bainville site did not result from a discharge from an above ground storage tank, no coverage exists under the EIL Policies for Cleanup Costs.

**COUNT VIII:   DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS UNDER THE EIL POLICIES FOR FINES, PENALTIES AND CERTAIN OTHER DAMAGES**

191.   Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

192.   The EIL Policies exclude coverage for "punitive or exemplary damages, multiplied damages, assessments, fines or penalties." [158]

193.   The *DEQ* Action seeks fines or penalties against DTT.

194.   The *Harmon* Action seeks punitive or exemplary damages.

//

---

[155]  Doc. 1-25.

[156]  Doc. 1-3.

[157]  Doc. 1-2.

[158]  Docs. 1-9 & 1-20 at 18.

195.    No coverage exists under the EIL Policies for punitive damages, fines, or penalties.

**COUNT IX:    DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS UNDER THE CPL POLICIES FOR POLLUTION CONDITIONS WHICH THE APPLICANT WAS AWARE OF AT THE TIME THE COVERAGE BEGAN**

196.    Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

197.    The CPL policies provide coverage for pollution conditions that occurred before the effective date of the policy only if:

> 3.  [O]n or prior to the effective date of this Policy, no insured had any knowledge of any circumstances which could reasonably be expected to give rise to a claim; and

> 4.   If the pollution condition was unexpected and unintended from the standpoint of the insured.[159]

198.    Although the 2012 CPL policy did not commence until October 1, 2012,[160] the *DEQ* Action alleges that DTT operated an unlicensed solid waste disposal facility at the Bainville site beginning on July 26, 2012.[161]

//

//

//

---

[159]  Docs. 1-10 to 1-11; 1-21 to 1-22 at 5 § I(A)(3)-(4).

[160]  Doc. 1-10.

[161]  Doc. 1-3 at 3, ¶ 15.

199.   The Montana DEQ Warning letter was sent to DTM and to DTT's manager, Anthony J. Alford, via certified mail with return receipt requested, on September 17, 2012. [162]

200.   DTT/DTM admitted to receiving the letter on or about September 17, 2012. [163]

201.   Likewise, although the 2013 CPL policy did not commence until October 1, 2013,[164] DTT received the first Violation Letter dated March 13, 2013 relating to the Solid Waste Management Facility that DTT was operating at the Bainville site. [165]

202.   DTT also received the second Violation Letter dated March 13, 2013 relating to an alleged leak from an above ground Poseidon Tank at the Bainville site before obtaining the 2013-2014 CPL Policy. [166]

203.   DTT responded to the second violation letter and a third violation letter with a letter dated March 20, 2013. [167]

204.   DTT received the fourth Violation Letter dated August 2, 2013 relating to the unlicensed facility at the property located at the Bainville site. [168]

---

[162] Doc. 1-5.

[163] Doc. 1-4 at 3.

[164] Doc. 1-22.

[165] Doc. 1-12.

[166] Doc. 1-13.

[167] Doc. 1-14.

[168] Doc. 1-15.

205.    DTM and Alford received the September 25, 2013 letter from the Harmons alleging contamination to the Bainville site and the Harmons' adjacent property. [169]

206.    The April 22, 2014 Violation Letter referenced DTT's December 13, 2013 admission that there were three suspected or known waste or storm water releases from the Bainville site. [170]

207.    No coverage exists under the CPL Policies for any pollution conditions that DTT, DTM, or DTI first discovered before the policy period.

208.    No coverage exists under the CPL Policies for any pollution conditions that were expected or intended from the standpoint of any insured.

209.    Because coverage does not exist under the CPL Policies, Admiral is entitled to a declaration that no duty to defend exists.

210.    Because coverage does not exist under the CPL Policies, Admiral is entitled to a declaration that no duty to indemnify exists.

**COUNT X:   DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS UNDER THE CPL POLICIES DUE TO MATERIAL MISSTATEMENTS IN THE CPL APPLICATIONS**

211.    Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

---

[169]  Doc. 1-16.

[170]  Doc. 1-23.

212.   The CPL policies provide that "[t]he Company's duty to provide for the defense of any insured, to pay damages on behalf of any insured, or to make any [additional payments] . . . shall immediately terminate . . . [i]f the application attached hereto and made a part of this Policy, including any addendum or addenda thereto, contains any material misrepresentations of fact."[171]

213.   The CPL policies further provide that:

The named insured acknowledges and agrees that:

1.    The warranties and representations contained in the Application for this Policy are true, correct and complete; and

2.    The Company issued this Policy in specific reliance upon the representations contained in the Application; and

3.    The Application is incorporated into, and is part of, this Policy.[172]

214.   DTT and DTI failed to disclose to Admiral the September 19, 2012 Warning Letter in their application for the 2012-2013 CPL Policies.[173]

215.   DTT and DTI failed to disclose to Admiral the four 2013 Violation Letters in their application for the 2013-2014 CPL Policies.[174]

216.   DTT and DTI failed to disclose to Admiral the September 25, 2013 letter from the Harmons alleging contamination to the Bainville site and the Harmons' adjacent property.

[171]  Docs. 1-10 & 1-11, 1-21 & 1-22 at 6, ¶ 7.
[172]  Docs. 1-10 & 1-11, 1-21 & 1-22 at 18 § J.
[173]  Docs. 1-7 & 1-8.
[174]  Docs. 1-18 & 1-19.

217.   DTT and DTI failed to disclose to Admiral any storm water runoff events that occurred before December 13, 2013 and were referenced in the April 22, 2014 Violation Letter.[175]

218.   No coverage exists under the CPL Policies because DTT and DTI made material misstatements and/or omissions on their 2012-2013 and 2013-2014 applications for CPL coverage.

219.   Because coverage does not exist under the CPL Policies, Admiral is entitled to a declaration that no duty to defend exists.

220.   Because coverage does not exist under the CPL Policies, Admiral is entitled to a declaration that no duty to indemnify exists.

**COUNT XI:   DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS UNDER THE CPL POLICIES FOR ANY DAMAGE TO PROPERTY OWNED, OCCUPIED, OR CONTROLLED BY A NAMED INSURED**

221.   Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

222.   The CPL policies exclude coverage for any "property damage to any real . . . property that was owned in whole or in part, or was rented, occupied or in the care, custody or control of any insured at any time."[176]

223.   DTT, DTM and/or DTI rented, occupied or controlled the Bainville site at the time the alleged pollution condition occurred.

---

[175]  Doc. 1-14.
[176]  Docs. 1-10 & 1-11, 1-21 & 1-22 at 15, § V(J).

224.    DTM asserts that it had a lease to own agreement with the Harmons for the entire Bainville site, that it made all of the payments, and that the Harmons have breached the contract by failing to provide DTM with title to the Bainville site. [177]

225.    No coverage exists under the CPL policies for the property damage to the Bainville Site that was owned, rented, occupied or controlled by DTT, DTM and/or DTI.

226.    Because coverage does not exist under the CPL Policies, Admiral is entitled to a declaration that no duty to defend exists.

227.    Because coverage does not exist under the CPL Policies, Admiral is entitled to a declaration that no duty to indemnify exists.

**COUNT XII:   DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS UNDER THE CPL POLICIES FOR MATERIALS TRANSPORTED BEYOND THE SITE AT WHICH THE INSURED WAS PERFORMING CONTRACTING OR SITE REMEDIATION SERVICES**

228.    Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

229.    The CPL Policies exclude coverage for "[a]ny claim arising out of any waste or other kind of products or materials transported, shipped or delivered via any automobile, aircraft, watercraft, or rolling stock to any location located beyond

---

[177] Doc. 1-4 at 13; Doc. 1-28.

the boundaries of a site at which any insured has performed any contracting or site remediation services."[178]   The *Harmon* Action alleges that DTT, DTM and/or DTI shipped or transported oil field waste from oil field sites to the Bainville site.[179]

230.   No coverage exists under the CPL Policies for any claim arising out of waste transported from an oil field site to the Bainville site.

231.   Because coverage does not exist under the CPL Policies, Admiral is entitled to a declaration that no duty to defend exists.

232.   Because coverage does not exist under the CPL Policies, Admiral is entitled to a declaration that no duty to indemnify exists.

## COUNT XIII:   DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS UNDER THE CPL POLICIES FOR THE INSUREDS' INTENTIONAL OR ILLEGAL ACTS

233.   Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

234.   The CPL Policies exclude coverage for:

> C.   Any claim arising from any insured's intentional, willful or deliberate non-compliance with any statute, regulation, ordinance, administrative complaint or notice of violation, notice letter, executive order, or instruction of a governmental agency or body; or
>
> D.   Any claim arising from an illegal, dishonest, fraudulent, criminal, or malicious act by any insured; . . .[180]

---

[178]   Docs. 1-10 & 1-11, 1-21 & 1-22 at 15, § V(I).
[179]   Doc. 1-2 at 7.
[180]   Docs. 1-10 & 1-11, 1-21 & 1-22 at 14 § V(C)-(D).

235.    The *DEQ* Action alleges that DTT failed to comply with Montana law.[181]

236.    The Warning Letter and the Six Violation Letters allege that DTT failed to comply with Montana law.[182]

237.    The *Harmon* Action alleges that DTT failed to comply with Montana law.[183]

238.    No coverage exists under the CPL Policies for any claims arising out of DTT or DTM's non-compliance with Montana law, with a notice violation, or with any illegal or criminal acts.

239.    Because coverage does not exist under the CPL Policies, Admiral is entitled to a declaration that no duty to defend exists.

240.    Because coverage does not exist under the CPL Policies, Admiral is entitled to a declaration that no duty to indemnify exists.

**COUNT XIV:    DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS UNDER THE CPL POLICIES DUE TO INSUREDS' FAILURE TO GIVE PROMPT NOTICE OR TO MITIGATE DAMAGES**

241.    Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

---

[181]  Doc. 1-3 at 2, ¶ 9.

[182]  Docs. 1-5, 1-12 to 1-15, 1-23, 1-25.

[183]  Doc. 1-2 at 11-15.

242.   The CPL policies provide that if an insured has "knowledge of circumstances which could reasonably be expected to give rise to a claim" then "the named insured shall have the duty to provide written notice to the Company as soon as practicable."  This written notice "shall be given whether or not the named insured believes that the claim, or incident giving rise to the insured's knowledge, will result in a demand that falls under, or in excess of, the Deductible."[184]

243.   The CPL policies require the named insured to "make all reasonable efforts to abate, stop, prevent, or reduce the damages emanating from any pollution condition resulting directly or indirectly from any operations performed by any insured."  These efforts "shall commence immediately upon discovery or notice of the pollution condition by any insured."  These efforts include "mitigating, alleviating or otherwise limiting the damages which could result from the pollution condition.  Such efforts must be undertaken even in the absence of a claim."[185]

244.   The *DEQ* Action alleges that DTT operated an unlicensed solid waste disposal facility at the Bainville site beginning on July 26, 2012.[186]

245.   DTT received the second Violation Letter dated March 13, 2013 relating to an alleged leak from an above ground Poseidon Tank at the Bainville site.[187]

---

[184]  Docs. 1-10 & 1-11, 1-21 & 1-22 at 15 § VI(A).
[185]  Docs. 1-10 & 1-11, 1-21 & 1-22 at 17 § VI(F).
[186]  Doc. 1-3 at 3, ¶15.
[187]  Doc. 1-13.

246.   DTM and Alford received the September 25, 2013 letter from the Harmons alleging contamination to the Bainville site and the Harmons' adjacent property.[188]

247.   The April 22, 2014 Violation Letter referenced DTT's December 13, 2013 admission that there were three suspected or known waste or storm water releases from the Bainville site. [189]

248.   DTM and Alford engaged in settlement negotiations with the Harmons in May 2014 regarding the environmental contamination at the Bainville Site and DTM's proposed purchase of the Bainville site. [190]

249.   No coverage exists under the CPL Policies for any pollution conditions that were not immediately reported to Admiral and/or which were not immediately abated by DTT and/or DTM.

250.   Because coverage does not exist under the CPL Policies, Admiral is entitled to a declaration that no duty to defend exists.

251.   Because coverage does not exist under the CPL Policies, Admiral is entitled to a declaration that no duty to indemnify exists.

//

//

//

---

[188]  Doc. 1-16.

[189]  Doc. 1-23.

[190]  Doc. 1-24 at 2.

## COUNT XV:   DECLARATORY JUDGMENT THAT NO COVERAGE EXISTS UNDER THE CPL POLICIES FOR EXEMPLARY DAMAGES

252.   Admiral re-alleges and re-pleads the allegations in the above paragraphs as though set forth herein.

253.   The CPL Policies defines damages to exclude "[a]ny amount of any civil judgment which is, or represents, any multiple of any kind of damage award, including, but not limited to, the two-thirds portion of any award of treble damages."[191]   The *Harmon* Action seeks punitive or exemplary damages.[192]

254.   No coverage exists under the CPL Policies for punitive damages.

### DEMAND FOR JURY TRIAL

Admiral demands a trial by jury for all issues so triable.

### PRAYER FOR RELIEF

Admiral thus requests this Court to declare and determine the rights of the parties, and construction, conditions, and exclusions of the terms of the Policies, and specifically declaring and entering a Judgment as follows:

A.   That Admiral has no duty to defend or indemnity DTT, DTM, DTI, or Alford against the allegations in the *Harmon* Action and the *DEQ* Action;

B.   That Admiral is entitled to withdraw from participating in the defense of DTT, DTM, DTI, and Alford in the *Harmon* Action and the *DEQ* Action; and

---

[191]  Docs. 1-10 & 1-11, 1-21 & 1-22 at 10, § II, Damages ¶ 5.

[192]  Doc. 1-2 at 42, ¶ J.

C.      Any other and further relief as the Court deems just and proper.

DATED this 6th day of November, 2020.


                        /s/  Emma L. Mediak
                        Attorneys for Plaintiff