# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| ADMIRAL INSURANCE COMPANY,<br><br>            Plaintiff,<br><br>vs.<br><br>DUAL TRUCKING, INC., a Louisiana corporation, DUAL TRUCKING OF MONTANA, L.L.C., a Louisiana limited liability company, DUAL TRUCKING AND TRANSPORT, L.L.C., a Louisiana limited liability company, and ANTHONY J. ALFORD, a Louisiana resident,<br><br>           Defendants. | **CV-20-53-GF-BMM**<br><br><br>**ORDER** |

## INTRODUCTION

Plaintiff in this case, Admiral Insurance Company ("Admiral"), has filed a Motion for Partial Summary Judgment. (Doc. 55). Defendants Dual Trucking and Transport, LLC ("DTT"), Dual Trucking of Montana, LLC ("DTM"), Dual Trucking, Inc. ("DTI") (collectively, the "Dual Entities"), and Anthony Alford ("Alford") oppose the Motion. (Doc. 67). This Order refers collectively to the Dual Entities and Alford as "Defendants" where appropriate.

Admiral seeks a partial summary judgment ruling that it has no duty to defend or indemnify Defendants under six insurance policies that Admiral issued to the Dual Entities over two years. (Doc. 56 at 5). Admiral's Amended Complaint (Doc. 48) and Motion for Partial Summary Judgment (Doc. 55) relate to two underlying Montana state district court lawsuits, Cause No. DV-15-15 (the "*Harmon* Action"), and Cause No. DV-14-67 (the "*Montana DEQ* Action"), each filed in Roosevelt County, Montana, and six Violation Letters sent from the Montana Department of Environmental Quality ("Montana DEQ") to Defendants.

## FACTUAL AND LEGAL BACKGROUND

DTT and DTM operate as Louisiana limited liability companies with their principal places of business in Houma, Louisiana. (Doc. 48 at 3). DTI operates as a Louisiana corporation with its principal place of business in Houma, Louisiana. *Id.* at 2. Alford, a resident of Terrebonne Parish, Louisiana, served as "[p]rincipal manager of DTM," (Doc. 58-1 at 4), "managing member" of DTT, (Doc. 31 at 5), and an officer of DTI, (Doc. 68 at 4), during the time frame relevant to this case.

DTI leased a tract of real property in Montana from Garth L. Harmon and Wagner Harmon (the "Harmons") in 2011. (Doc. 48 at 4–5). DTI assigned its right in the lease to DTM later that year. *Id.* DTM and the Harmons then terminated the original lease, and DTM leased three tracts of land from the Harmons. *Id.* at 5. The DTM-Harmon leases included the entire portion of the original DTI-Harmon lease.

2

*Id.* The three DTM-Harmon leases included a purchase option for DTM. *Id.* The three lease tracts collectively constitute the "Bainville Site." *Id.*

Montana DEQ sent a Warning Letter dated September 17, 2012, to Alford, as representative of the Dual Entities. (Doc. 48 at 5). The Warning Letter advised Defendants that Montana DEQ had received a complaint on July 26, 2012, alleging that oil field exploration and production waste ("Special Waste") had been placed on the Bainville Site without a Solid Waste Management Facility license. (Doc. 1-5). The Warning Letter further advised Defendants that, if these allegations were correct, Defendants were operating "in violation" of the Montana Solid Waste Management Act ("SWMA"), Mont. Code Ann. §§ 75–10–212, –221. *Id.* The Warning Letter required Defendants, within 15 days, to "hire an environmental consultant and develop a corrective action plan for cleaning up the Special Waste on the [Bainville Site]." *Id.* The Warning Letter directed that, within 30 days, "the Special Waste must be legally removed and properly disposed of," and, within 60 days, Defendants must provide to Montana DEQ a "cleanup report" completed by Defendants' "environmental consultant." *Id.*

Defendants dispute the significance of the Warning Letter. (Doc. 68 at 6). Defendants insist that the Warning Letter "merely reported an unsupported hearsay allegation barren of fact" and characterize the Warning Letter as "merely advisory." *Id.* Notably, the Warning Letter cautions that, in the event Defendants

fail to follow the letter's requirements, Montana DEQ stood "prepared to initiate a formal enforcement action that may include the assessment of penalties." (Doc. 1-5).

*The Insurance Policies*

DTT applied for, and Admiral issued, two Environmental Impairment Liability Policies ("EIL Policies") for coverage at the Bainville Site. (Doc. 48 at 11). The first listed a policy period from October 1, 2012, to October 1, 2013 ("2012–2013 EIL Policy"), and the second listed a policy period from October 1, 2013, to October 1, 2014 ("2013–2014 EIL Policy"). The EIL Policies list DTT as the named insured. (Doc. 48 at 6). EIL Policies are claims-made policies, designed to provide coverage for certain pollution conditions at a property that the named insured owns or controls. (Doc. 56 at 5). Admiral's EIL policy application asks multiple questions regarding whether DTT operated in compliance with applicable environmental laws and whether DTT knew of any conditions at the insured location that might lead to a claim under the EIL Policies. (Doc. 57 at 8). DTT failed to include its receipt of the September 17, 2012 Warning Letter from Montana DEQ in its 2012–2013 EIL Policy application. (Doc. 56 at 21).

Admiral also issued four Contractor Pollution Liability Policies ("CPL Policies"), two to DTI and two to DTT. (Doc. 57 at 11–14, 27–30). The CPL Policies named DTM as an additional insured. *Id.* The first two CPL Policies listed

a policy period of October 1, 2012, to October 1, 2013 ("2012–2013 CPL Policies"). (Doc. 56 at 6). The second two CPL Policies listed a policy period of October 1, 2013, to October 1, 2014 ("2013–2014 CPL Policies"). *Id.*

*The Six Violation Letters and Two State Court Cases*

Montana DEQ sent the following three Violation Letters in quick succession to representatives of the Dual Entities, including Alford: (1) Violation Letter from Mont. DEQ to DTT, *Solid Waste & Open Burning Complaint [CVID # 16354]*, March 12, 2013 ("Violation Letter 1") (Doc. 58-14); (2) Violation Letter from Monta. DEQ to DTT, *Violations of Solid Waste Mgmt. Act [CVID # 15855]*, March 13, 2013 ("Violation Letter 2") (Doc. 58-15); and (3) Violation Letter from Mont. DEQ to DTT, *Liquid Invert Spill at CR 1009, Bainville, Roosevelt Cty., Mont. [CVID # 16391]*, March 13, 2013 ("Violation Letter 3") (Doc. 58-17).

Violation Letter 1 referenced the September 17, 2012 Warning Letter, and detailed allegations that the Dual Entities improperly were storing and disposing of solid waste, dumping "Liquid Invert" and contaminated soil and water on the ground, and burning Tyvek suits and trash at the Bainville Site. (Doc. 58-14). Violation Letter 2 asserts that DTT had not performed the required items listed in the September 17, 2012 Warning Letter related to the unlicensed Solid Waste Management Facility that DTT was operating at the Bainville Site. (Doc. 58-15). Violation Letter 3 advised DTT that DEQ had received a report of a leak from an

5

above-ground Poseidon Tank at the Bainville Site. (Doc. 58-17). Violation Letter 3 also advised that a spill of 1500 barrels of "Liquid Invert" qualified as an improper disposal of solid waste and constituted a violation of the Montana SWMA. *Id.*

DTT responded to the first three Violation Letters with a single letter dated March 20, 2013. (Doc. 58-18). Montana DEQ later received on June 10, 2013, an application from DTT for a Solid Waste Management Facility license at the Bainville Site. (Doc. 58-19).

Montana DEQ sent a fourth Violation Letter dated August 2, 2013, to DTT related to the unlicensed Solid Waste Management Facility at the Bainville Site. *See* Letter from Mont. DEQ to DTT, *Proposed Dual Trucking Treatment Facility—Bainville, Mont., Site Inspection Report—Violation Letter*, August 2, 2013 ("Violation Letter 4"). (Docs. 58-20, 58-21). Violation Letter 4 acknowledges that DEQ had received DTT's application for a Solid Waste Management Facility License on June 10, 2013. (Doc. 58-20). Violation Letter 4 also notes that DTT was engaged in the ongoing management of solid wastes at the facility, an act that qualifies as operation of a Solid Waste Management Facility without a license in violation of the SWMA. *Id.*

On September 25, 2013, the Harmons sent Alford and DTM a letter ("Breach of Contract Letter") asserting that DTM had breached the three lease agreements at the Bainville site. (Doc. 58-22). The Breach of Contract Letter

alleged that the Dual Entities had "caused environmental impairment to the Property" and had "used the property in a manner that has caused pollution of waterways flowing through or underneath the property." *Id.*

DTT failed to attach any of the four Violation Letters or mention the pollution referenced in the Breach of Contract Letter when it renewed its 2013–2014 EIL Policy. (Doc. 57 at 24). The same proved true for the renewal of the 2013–2014 CPL Policies. (Doc. 57 at 28).  DTT again failed to attach nay of the Violation Letters or mention the Breach of Contract Letter.

Montana DEQ sent a settlement offer to DTT on December 4, 2013, seeking to address DTT's violations of the Montana SWMA. *See* Letter from Mont. DEQ to DTT, *Proposed Administrative Order on Consent, Docket No. SW-13-01 (FID 2271)*, Dec. 4, 2013 ("DEQ AOC Settlement Offer"). (Doc. 58-23). In response to the DEQ AOC Settlement Offer, DTT employed HydroSolutions, Inc., to prepare a Site Characterization and Environmental Condition Report ("2013 Site Report"). (Doc. 57 at 31–32; Doc. 58-24). DTT submitted the 2013 Site Report to Montana DEQ on December 13, 2013. (Doc. 57 at 31–32).

DTT admitted in the 2013 Site Report to three prior "suspected or known release" events. *Id.* DTT described all three events as "Storm Water" related and as a berm breach lasting for three hours. *Id.* DTT prepared a revised Site Characterization and Environmental Condition Report in February 2014. *See* Site

Characterization & Envtl. Condition Rep. (Revised), February 2014 ("2014 Revised Site Report"). *Id.* DTT admits in the 2014 Revised Site Report that the three previously disclosed release events occurred in July 2013. *Id.* Montana DEQ and DTT then engaged in settlement negotiations, and sent back and forth proposed redline changes to different settlement offers. *Id.*

Montana DEQ sent a fifth Violation Letter to the Dual Entities on April 22, 2014. *See* Letter from Mont. DEQ to Dual Entities, *Request to cease solid waste mgmt. operations at DTM; Mont. DEQ enforcement action for violations of Mont. SWMA [FID 2271]*, Apr. 22, 2014 ("Violation Letter 5"). (Doc. 58-29). Violation Letter 5 stated that DTT illegally had managed solid wastes at the Bainville Site without a Solid Waste Management Facility license since at least July 2012. (Doc. 58-29). Violation Letter 5 acknowledges that DTT had submitted an application for a Solid Waste Management Facility license, but states that Montana DEQ had found DTT's application to be deficient and DTT had not responded adequately to the deficiency letter. *Id.* Montana DEQ advised that DTT's application had expired. *Id.* Montana DEQ directed DTT to submit a new application for a Solid Waste Management Facility license. *Id.*

DTI responded to Violation Letter 5 on April 25, 2014. *See* Letter from Julius P. Hebert, Jr. to Mont. DEQ, *Violation letter to DTI dated Apr. 22, 2014*, Apr. 25, 2014 ("DTI April 2014 Response Letter"). (Doc. 58-30). DTT separately

responded to Violation Letter 5 on April 30, 2014. *See* Letter from A. Joselyn to
Mont. DEQ, *Dual Trucking: Your Apr. 22, 2014 Violation Letter*, Apr. 30, 2014
("DTT April 2014 Response Letter"). (Doc. 58-31). DTT advised Montana DEQ in
its letter that DTT had ceased operations at the Bainville Site. (Doc. 58-31).

Counsel and representatives of DTT met with Montana DEQ on May 6,
2014, to discuss the ongoing issues at the Bainville Site. (Doc. 58-34). Montana
DEQ advised DTT that it believed the Dual Entities were responsible for water
quality violations discovered in surface water samples taken from the Bainville
Site. *Id.*

Defendants and the Harmons engaged in settlement negotiations regarding
the environmental contamination at the Bainville Site and DTM's proposed
purchase of the Bainville Site. (Doc. 58-35). The record reveals that the parties
detailed a number of payment terms in an email chain dated May 20, 2014. *Id.* at 2.
DTM later asserted that it owns the Bainville Site after paying a total of $729,000
for the property, equating to $25,000 per acre for the actual surveyed size of the
property. (Doc. 58-4 at 4).

Montana DEQ sent a sixth Violation Letter to the Dual Entities on June 26,
2014, related to the unlicensed Solid Waste Management Facility at the Bainville
Site. *See* Letter from Mont. DEQ to Dual Entities, *Violations of the Water Quality
Act [FID #2271]*, June 26, 2014 ("Violation Letter 6"). (Doc. 58-39). Violation

Letter 6 references DTT's December 13, 2013 admission that DTT had three suspected or known waste or storm water released at the Bainville Site. *Id.*

DTT cancelled the 2013–2014 EIL Policy effective July 1, 2014, and received a partial reimbursement of its premium. (Doc. 59-8 at 50). The 2013–2014 EIL Policy entitles an insured to an automatic 30-day extended reporting period upon cancellation of the Policy. *Id.* at 24. The 2013–2014 EIL Policy states that the "Automatic Extended Reporting Period shall apply to *Claims* first made within the Automatic Extended Reporting Period but only with respect to *Pollution Conditions* that (a) are *Discovered* and reported during the Automatic Extended Reporting Period." *Id.* (emphasis in original). The EIL Policy defines the term "Discovered" to mean "the point in time at which any officer, director, executive or employee responsible for environmental compliance of an Insured becomes aware of the existence of a *Pollution Condition*." *Id.* at 13 (emphasis in original).

Admiral asserts that it had not received notice of any claims related to the Bainville Site on or before July 1, 2014. (Doc. 58-1 at 5; Doc. 60). The following day, on July 2, 2014, DTT provided Admiral with the first notice of any claims related to the Bainville Site. (Doc. 60; Doc. 60-1). The Notice of Claim filed by DTT indicates that the date of occurrence had been July 5, 2013. (Doc. 60-1). The Notice of Claim seeks coverage under the 2012–2013 EIL Policy that was in effect at the time of the July 5, 2013 occurrence. *Id.* DTT attached Violation Letter 6 to

its July 2, 2014 Notice of Claim. (Doc. 68 at 66). DTI provided Admiral with a

Notice of Claim on July 3, 2014, asserting the same claim as those stated in DTT's

Notice of Claim. (Doc. 68 at 66–67).

On November 25, 2014, Montana DEQ filed the *Montana DEQ* Action,

Cause No. DV-14-67, and included an application for an injunction against DTT

related to DTT's use of the Bainville Site as an unlicensed Solid Waste

Management Facility. (Doc. 68 at 67–68). Montana DEQ alleges that DTT

operated an unlicensed Solid Waste Management facility at the Bainville Site from

July 26, 2012, until April 30, 2014. *Id.* at 68. On June 23, 2015, the Harmons filed

a second amended complaint in the *Harmon* Action, Cause No. DV-15-15, against

Defendants. *Id.* at 69. The Harmons allege that Defendants have operated an

unlicensed Solid Waste Management Facility on the Bainville Site and have caused

or allowed pollutants to remain on the site, and to migrate off the site to

surrounding properties. *Id.* The Harmons point to the allegations in the *Montana

DEQ* Action, Cause No. DV-14-67, to support their contentions. *Id.* DTM filed a

counterclaim against the Harmons and has filed a separate quiet title action

alleging that DTM had a lease-to-own agreement for the entire Bainville Site and

that the Harmons had received full payment for the Bainville Site, but have refused

to transfer title to DTM. *Id.* at 69–70.

DTM hired Terracon Consultants, Inc. ("Terracon"), an environmental consulting firm, to conduct testing at the Bainville Site in response to the pollution allegations. *Id.* at 70. Terracon has concluded that no contamination migrated off of the leased Bainville Site onto neighboring property. *Id.*

## LEGAL STANDARDS

This case came before this Court upon a transfer from the United States District Court for the Eastern District of Louisiana. (Doc. 23). In cases where the defendants seek transfer, "the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue." *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). With respect to the applicable state law, a change of venue under 28 U.S.C. § 1404(a) generally should constitute "but a change of courtrooms." *Id.* The Eastern District of Louisiana determined that the transferee federal district court, in this case, the District of Montana, should apply Louisiana law in interpreting the insurance policies at issue. (Doc. 23 at 15–16).

As for Admiral's Motion for Partial Summary Judgment (Doc. 55), the Court shall grant summary judgment if the movant shows that there exists no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the

outcome of the suit under the state substantive law are considered "material."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

Admiral argues that it stands entitled to partial summary judgment on a number of points. Defendants respond that Admiral fails to present a justiciable claim, and insists that a number of material facts remain in dispute, thereby rendering summary judgment improper in this case. This Order addresses each of these arguments in turn.

## I.   Whether Admiral presents a justiciable claim.

Admiral seeks a declaration that it maintains no obligation to continue paying Defendants' defense costs in the underlying state court cases, and that it will not be obligated to indemnify Defendants. (Doc. 56). Defendants counter that Admiral fails to present a justiciable claim. (Doc. 67 at 7–9).

Montana employs a three-part test for determinations on justiciability. *Northfield Ins. Co. v. Mont. Ass'n of Ctys.*, 10 P.3d 813, 816 (Mont. 2000). A justiciable controversy first requires that parties have existing and genuine rights or interest, as opposed to merely theoretical rights. *Id.* Second, the controversy must present issues that render the court's judgment operative, as distinguished from a debate or argument invoking a purely political, administrative, philosophical, or academic conclusion. *Id.* Lastly, the controversy must require a judicial

13

determination with the effect of a final judgment in law or equitable decree of the rights, status, or legal relationships of one or more of the real parties interest. Should the controversy lack those necessary features, the controversy still may prove justiciable where it involves issues "of such overriding public moment as to constitute the legal equivalent" of each factor. *Id.*

Defendants insist that Admiral "fails to establish any of these requirements." (Doc. 67 at 8). Defendants allege that unresolved related issues remain in the underlying state court actions that ultimately may affect whether Admiral owes a duty to indemnify Defendants. *Id.* at 9. Defendants contend that these unresolved related issues render premature any ruling by this Court on Admiral's indemnity obligations to Defendants. *Id.*

The Court disagrees that the issues of insurance coverage in the present declaratory judgment action rely upon the resolution of issues raised in the underlying *Montana DEQ* Action, Cause No. 14-67, or the *Harmon* Action, Cause No. 15-15. Admiral seeks a declaration that Defendants lost coverage under their six insurance policies for three separate reasons. Admiral first contends that Defendants' alleged material misstatements in their policy applications violated the terms of the Policies. (Doc. 55). Admiral next argues that Defendants' purported knowledge of pollution at the Bainville Site before the policy periods and extended reporting periods violated the Policies' terms. And finally, Admiral suggests that

14

the fact that Defendants rented, occupied, or controlled the Bainville Site precludes coverage. The determinations that Admiral seeks may be made separate and apart from the conclusion of the underlying cases.

## II.   Whether the Dual Entities' failure to provide notice of a claim during the policy period precludes coverage under the 2012–2013 EIL Policy.

Admiral first asserts that the Dual Entities failed to provide notice to Admiral of any claim during the 2012–2013 EIL Policy period. (Doc. 56 at 5–6). The Dual Entities first provided Admiral with notice of the pollution condition at the Bainville Site on July 2, 2014. (Doc. 68 at 16). The July 2, 2014 Notice filed by DTT listed the "date of occurrence" as July 5, 2013, which falls within the 2012–2013 EIL Policy period. (Doc. 56 at 8). DTT sought coverage for the July 5, 2013 occurrence under the 2012–2013 EIL Policy. *Id.*

DTI provided Admiral with notice of the pollution condition at the Bainville Site on July 3, 2014, the day after DTT had filed its notice. *Id.* DTI also sought coverage under the 2012–2013 EIL Policy, and listed the "date of occurrence" as July 5, 2013. *Id.* Admiral claims that no coverage exists under the 2013–2013 EIL Policy because the Dual Entities failed to report any claim to Admiral during that policy period. (Doc. 56 at 9).

Admiral describes the 2012–2013 EIL Policy as a "claims made" policy. (Doc. 56 at 9; Doc. 68 at 16). The 2012–2013 EIL Policy "provides coverage for certain pollution conditions only if the pollution condition was 'Discovered and

15

reported to [Admiral] during the Policy Period, the Automatic Extended Reporting Period or the Optional Extended Reporting Period, if any.'" (Doc. 68 at 16). In its Statement of Undisputed Facts, Admiral states that it "did not receive any notice of a claim related to the Bainville site during the October 1, 2012 to October 1, 2013 policy period." (Doc. 57 at 10). Defendants "dispute" Admiral's statement that it did not receive notice of a claim during the 2012–2013 EIL Policy period. (Doc. 68 at 16). Defendants cite the Declaration of Ronald Ronzello (Doc. 60), Vice President of Claims for Berkley Custom Insurance Managers, as support for their disputation of Admiral's statement. (Doc. 68 at 16).

Defendants' sole basis for disputing Admiral's statement was that "Admiral received notices of potential claims in July 2013 as admitted by Ronzello." *Id.* The Court has reviewed Ronzello's declaration. Ronzello's declaration clearly states that Admiral "did not receive any notice of a claim related" to DTT's facility at the Bainville Site during the October 1, 2012 to October 1, 2013 EIL Policy period. (Doc. 60 at 2). Ronzello goes on to state that the first notice of claim that Admiral received was filed by DTT on July 2, 2014. *Id.* Contrary to Defendants' assertion, Ronzello's statement supports Admiral's claim that the Dual Entities failed to report any claim to Admiral during the 2012–2013 EIL Policy period. (Doc. 56 at 9).

An insurance policy serves as a contract between the insured and insurer, with the effect of law between them. *Gorman v. City of Opelousas*, 148 So.3d 888, 892 (La. 2014). A court's role in interpreting an insurance contract involves ascertaining the common intent of the insured and the insurer as reflected by the policy's words. *Id.* Where the words of an insurance contract stand clear and explicit, courts must enforce the contract as written and make no further interpretation of the parties' intent. *Id.*

Louisiana law provides that a "claims made" policy limiting coverage to those claims "made and reported during the policy period" delineates the scope of coverage bargained for by the insurer. *Hood v. Cotter*, 5 So.3d 819, 829 (La. 2008). "The purpose of a reporting requirement in a claims-made policy is to define the scope of coverage purchased by the insured by providing a certain date after which an insurer knows it is no longer liable under the policy." *Gorman*, 148 So.3d at 893. Under a claims-made policy, "the risk of a claim incurred but not made, as well as a claim made but not reported," shifts to the insured. *Id.* The insurer can "close its books" on that policy once the policy period and reporting period expire. *Id.*

The unambiguous policy terms here provide that coverage under the 2012–2013 EIL Policy exists only if Defendants' claim was discovered *and* reported within the applicable policy period. *See Gorman*, 1487 So.3d at 893. Defendants

17

have failed to put forth any evidence showing that a material dispute of fact arises from Admiral's assertion that it received no notice of any claim related to the Bainville Site during the 2012–2013 EIL Policy period. Defendants further fail to dispute that this failure to receive notice eliminates coverage under the terms of the 2012–2013 EIL Policy. The Court concludes that Admiral is entitled to summary judgment that no coverage exists under the 2012–2013 EIL Policy for the pollution conditions at the Bainville Site. Admiral possesses no duty to defend the Defendants for claims arising under the 2012–2013 EIL Policy.

**III.    Whether the Dual Entities are precluded from coverage under the 2013–2014 EIL Policy.**

Admiral next argues that no coverage exists for the July 2, 2014 Claim. (Doc. 56 at 6). Admiral notes that DTT canceled the 2013–2014 EIL Policy on July 1, 2014. *Id.* Admiral claims that DTT provided its first Notice of Claim on July 2, 2014, during the automatic extended reporting period. *Id.* Admiral contends that no coverage exists for the July 2, 2014 Claim because the Dual Entities discovered the pollution condition before the automatic extended reporting period began. *Id.*

The 2013–2014 EIL Policy provides coverage for certain pollution conditions that may have been discovered during the policy period of October 1, 2013, to October 1, 2014. (Doc. 57 at 26). DTT cancelled the 2013–2014 EIL Policy effective July 1, 2014. (Doc. 59-8 at 50). DTT received a partial

18

reimbursement of its premium after this cancellation. *Id.* Admiral received no notice of any claim related to the Bainville Site on or before July 1, 2014. (Doc. 56 at 16). As a result, Admiral did not receive notice of any claim during the 2013–2014 EIL Policy period. *Id.*

The 2013–2014 EIL Policy entitles the insured to an automatic 30-day extended reporting period upon cancellation of the Policy. (Doc. 59-8 at 24). The 2013–2014 EIL Policy states that the "Automatic Extended Reporting Period shall apply to *Claims* first made within the Automatic Extended Reporting Period but only with respect to *Pollution Conditions* that (a) are *Discovered* and reported during the Automatic Extended Reporting Period." *Id.* (emphasis in original). The term "Discovered" as used in the 2013–2014 EIL Policy means "the point in time at which any officer, director, executive or employee responsible for environmental compliance of an Insured becomes aware of the existence of a *Pollution Condition.*" *Id.* at 13 (emphasis in original).

DTT's July 2, 2014 notice of occurrence identified the date of the incident as July 5, 2013. (Doc. 56 at 8). DTT sought coverage under the 2012–2013 EIL Policy, and *not* under the 2013–2014 EIL Policy. *Id.* Defendants acknowledge receipt of four Violation Letters and the Harmons' Breach of Contract Letter before the 2013–2014 EIL Policy period. (Doc. 68 at 22–36). Defendants also acknowledge their awareness of the July 2013 stormwater releases before the

2013–2014 EIL Policy period. *Id.* at 48–49. Defendants further acknowledge that they engaged in settlement discussions with Montana DEQ and received Violation Letter 5 before the 2013–2014 EIL Policy extended reporting period. *Id.* at 49–52. Defendants fail to dispute that the 2013–2014 EIL Policy period precludes coverage for any pollution condition that the Defendants "discovered" before October 1, 2013, or that they had knowledge of before the extended reporting period. (Doc. 72 at 4).

Defendants instead assert that "certainly coverage *has not been requested* by Dual with respect to" the "July 5, 2013" stormwater release. (Doc. 67 at 12 (emphasis added)). The July 2013 stormwater releases constitute the only claims that Defendants made under either EIL Policy during the extended reporting period. (Doc. 72 at 4). Beyond DTT's July 2, 2014 notice of claim, and DTI's July 3, 2014 notice of claim, Admiral alleges that it received no notice of any other claim or possible claim before August 1, 2014, after the thirty-day extended reporting period had expired. (Doc. 72 at 4). The *Montana DEQ* Action, Cause No. DV-14-67, was not filed until November 25, 2014, long after the expiration of the extended reporting period. (Doc. 58-40). The *Harmon* Action, Cause No. DV-15-15, was not filed until 2015. (Doc. 58-12). Defendants fail to dispute that no coverage exists under a claims-made policy if no timely claim was made. (Doc. 72 at 5).

To this point, Admiral has provided a defense to Defendants in the underlying state court claims under the 2013–2014 EIL Policy because some of the allegations in the *Montana DEQ* Action and the *Harmon* Action could relate to the July 2013 stormwater releases. (Doc. 72 at 5). Defendants concede in their summary judgment briefing, however, that they do not seek any coverage for these July 2013 stormwater releases, and that no timely claim was made, under the 2013–2014 EIL Policies. *Id.* Under these facts, Admiral contends that no basis exists for its continued defense of Defendants under the 2013–2014 EIL Policy. *Id.* The Court agrees.

No coverage exists under the 2013–2014 EIL Policy because Defendants knew of the alleged pollution condition at the Bainville Site before the 2013–2014 EIL Policy's inception and before the extended reporting period. Additionally, no coverage exists under the 2013–2014 EIL Policy because Defendants failed to provide notice to Admiral during the extended reporting period of the claims for which they currently seek coverage. Admiral has no duty to defend or indemnify the Defendants under the 2013–2014 EIL Policy.

The Court declines to address Admiral's alternative arguments that both EIL Policies are void ab initio in light of its determination that the Dual Entities are precluded from coverage under both the 2012–2013 EIL Policy and the 2013–2014 EIL Policy. (Doc. 56 at 18–24).

21

IV.   **Whether the Dual Entities are precluded from coverage under the four CPL Policies.**

Admiral argues that the Dual Entities made material misstatements in their four CPL Policy applications by "failing to truthfully answer questions regarding their compliance with Montana environmental laws, their knowledge of Montana DEQ's multiple Warning and Violation Letters, their knowledge of the Harmons' allegations of pollution at the Bainville Site, and their knowledge of the pollution at the Bainville Site." (Doc. 68 at 6). Admiral asserts that it issued each of the four CPL Policies in specific reliance upon the representations made by the Dual Entities in the applications. *Id*. at 6–7. Admiral argues that these misrepresentations by the Dual Entities support a grant of summary judgment in Admiral's favor on the issue of coverage under the CPL Policies. *Id.*

The CPL Policies state that Admiral's "duty to provide for the defense of any insured, to pay damages on behalf of any insured, or to make any [additional payments] . . . shall immediately terminate . . . [i]f the application attached hereto and made a part of this Policy, including any addendum or addenda thereto, contains any material misrepresentations of fact." (Doc. 68 at 20, 45).

No coverage exists under Louisiana law if the Dual Entities made material misstatements in their CPL Policy applications. *F.D.I.C. v. Duffy*, 835 F. Supp. 307, 313 (E.D. La. 1993). An applicant's misrepresentations are considered "material" if they affect the decision of the insurer to issue the policy. *Id.*

22

Louisiana law does not require strict proof of fraud to show that an applicant acted with intent to deceive. *Id.* at 314. A court can determine an intent to deceive from the following indicators: (1) the attending circumstances that tend to show the insured's knowledge of the falsity of the representations made in the application and his or her recognition of the materiality thereof; or (2) from circumstances that create a reasonable assumption that the insured recognized the materiality of the misrepresentations. *Id.* (quoting *Johnson v. Occidental Life Ins. Co.*, 368 So.2d 1032, 1036 (La. 1979)).

The 2012–2013 CPL Policy applications asked whether, in the past three years, any member of the application firm was "aware of any circumstances that could result in a claim, suit or notice of incident being brought against them?" (Doc. 56 at 28). Both DTI and DTT responded by checking the "no" box in 2012. *Id.* Neither DTI nor DTT supplied Admiral with a copy of the September 17, 2012 Warning Letter from Montana DEQ. *Id.*

In their 2013–2014 CPL Policy applications, DTT and DTI again responded that they were not "aware of any circumstances that could result in a claim, suit or notice of incident being brought against them." *Id.* at 29. With respect to their 2013–2014 CPL Policy applications, neither DTI nor DTT provided Admiral with a copy of the September 17, 2012 Warning Letter or any of the first four Violation Letters, each of which the Dual Entities received in advance of the applications'

23

submission. *Id.* DTI and DTT also failed to provide Admiral with information regarding the three stormwater releases that had occurred at the Bainville Site in July 2013. *Id.* DTI and DTT further failed to apprise Admiral of the Harmons' September 25, 2013 Breach of Contract Letter, in which the Harmons allege environmental impairment at the Bainville Site. *Id.*

Admiral alleges that DTT and DTI made material misstatements on their 2012–2013 CPL Policy applications by failing to disclose the existence of the September 17, 2012 Warning Letter. *Id.* Admiral further argues that DTI and DTT made material misstatements on their 2013–2014 CPL Policy applications, by failing to notify Admiral of the September 17, 2012 Warning Letter, the four Violation Letters, the three stormwater releases, and the Harmons' Breach of Contract Letter. *Id.* Admiral insists that the sheer number of nondisclosures made by the Dual Entities in their CPL Policy applications support a conclusion that the Dual Entities acted deliberately to conceal this information, in recognition of the materiality of their misstatements. *Id.* at 30. Admiral insists that it would have declined issuance of the CPL Policies if DTT and DTI truthfully had answered the questions in the CPL Policy applications. *Id.*

The Court agrees that the Dual Entities materially misrepresented their knowledge of the pollution conditions at the Bainville Site, in both the 2012–2013 CPL Policies and the 2013–2014 CPL Policies. Under the terms of the CPL

24

Policies, any duties that Admiral owes to the Dual Entities shall "terminate" as a result of a material misstatement. (Doc. 56 at 30). Admiral is entitled to a summary judgment ruling that it owes no duties to the Dual Entities under the four CPL Policies because of the Dual Entities' material misstatements. Admiral owes no duty to defend or indemnify Defendants under the four CPL Policies. The Court's decision that the CPL Policies are void ab initio necessarily encompasses any CPL Policy claims related to property damage incurred on the Bainville Site. The Court, therefore, will not address these arguments by Admiral.

**ORDER**

Accordingly, **IT IS ORDERED** that Admiral's Motion for Partial Summary Judgment (Doc. 55) is **GRANTED.**

Dated this 5th day of May, 2021.

Brian Morris, Chief District Judge
United States District Court